We are now ready for argument in 12-2498. Ms. Goldman. Ms. Goldman May I please the court, Lauren Goldman from Mayor Brown for Appellant Philip Morris USA. In 2009 Congress decided that the excise tax scheme governing tobacco products was wrong. Congress felt that large cigars were undertaxed relative to their value and the amount of tobacco that they contained. And it felt that small cigars were undertaxed relative to cigarettes, which Congress viewed as their close substitutes. So Congress raised the rates on all of the tobacco products in order to fund a federal program, but it raised the rates on cigars much more than it raised the rates on cigarettes. From 2005 when FETRA was enacted until 2009, everyone including Philip Morris, the cigar industry, USDA and Congress believed that at some point Congress would change the federal excise tax rates on tobacco and that USDA would apply those new rates in allocating the FETRA assessments among the classes. But after Congress enacted CHIPRA and dramatically changed the excise tax structure, USDA did an about face and said we are not going to raise the rates because it would dramatically change the allocation of the burden across the classes. I'm a little unclear about how that represented an about face. Well, USDA's regulation that it enacted shortly after FETRA, sorry, the regulation that USDA adopted shortly after FETRA was enacted stated that the assessment would be divided among the classes based on each class's share of the excise taxes paid. So taxes are paid under current rates. I thought that the 2003 excise taxes were used pre-2009, but the issue didn't really arise until CHIPRA, did it? Well it did in the following sense, Your Honor. Excise tax rates change all the time. They had been amended four times in the 15 years before FETRA was enacted. The changes apparently in the CHIPRA changes were pretty dramatic and that's what drove the 2010 technical amendment? Sort of, Your Honor. In the past, the rates had changed periodically. They were often changed disproportionately to reflect congressional policy. So everybody understood and as a matter of law, everybody understood that the tax rates would change. When USDA committed that the class shares would be based on the excise taxes paid and further committed that the value of the excise taxes paid would be based upon reports filed by manufacturers and importers that contained information about the amount of taxes actually paid under real current rates, USDA was saying we will apply current rates. But then Congress changed the structure and it reallocated much of the excise tax burden away from cigarettes and towards cigars in order to better reflect the relative value and the way consumers view those products. And you want to continue to do that? I'm sorry? You want to continue to do that? We want to continue to do that? Yes. We want USDA to adopt and apply those policies that Congress enacted as part of CHIPRA. So we're not going to base the allocations on the taxes paid. We're going to base them on taxes paid using for all tax years, using for all years the taxes that were in place in 2003. Taxes are not currently paid based on old tax rates. So USDA is applying this hybrid of current removals and old tax rates. It's our position that that is that violates the language and the structure of FEDRA and it vitiates congressional intent, both in FEDRA and in subsequent statutes. And when you say it violates the language of FEDRA, we're going back to Chevron Step 1? We are. We are in Chevron Step 1. And so, I'm sorry, Your Honor. No, go ahead. So we start with the text of the statute, okay? So in Section C1 of the statute, which is the way to divide the allocation across the classes. So volume quantity is measured in sticks for cigarettes and cigars and in pounds for the other classes. And Congress said what we're going to do is we're going to look at each class' share of the excise tax burden and use that as a proxy for its share of the overall tobacco market. And then in Section C2, Congress instructed USDA to adjust the class shares based on changes in the share of gross domestic volume held by each class. So every word of that sentence is critical. Adjust means that USDA is to use the same methodology that Congress had adopted, which involved using each class' share of the excise taxes paid. Changes in the share. Congress didn't say changes in the number of sticks and pounds sold. It said changes in the share. Share is a percentage, and you can only get to a percentage. What Congress chose was excise taxes. Gross domestic volume. Right, but I don't, I understand up to that point. What I don't see, and I don't really even think it's disputed, but where is it that, what is it in the text that specifies the excise tax, that you can't use the same methodology and the same excise tax year that Congress used? The 2003 excise tax works just as well, does it not, in C2 as the then current excise tax rate? It does not, Your Honor. At Chevron's step, just to take a step back and then address the Court's question more specifically. At Chevron's step one, the question is not whether the statute says you can't use 2003 excise taxes. The question, as the Court is aware, obviously, is whether we can discern the intent of Congress. Both in C2 and throughout the FETRA statute, Congress made clear that it expected USDA to apply FETRA using the current provisions of the Internal Revenue Code and current Congressional law. So when the Court said changes in when Congress said changes in the share of gross domestic volume, gross the share of gross domestic volume is the product of removals times tax rates. Changes in the product of removals times tax rates means changes in either removals or tax rates. Additionally, Congress defined gross domestic volume. Gross domestic volume is the product that we count for purposes of the of this provision. Gross domestic volume is defined in Section A2 of the statute as removals that are not exempt from tax under Chapter 52 of the Internal Revenue Code at the time of their removal. So Congress is saying very clearly we're looking at the current provisions of the Internal Revenue Code at the time when the product is removed. I'm really not trying to be argumentative. I found this statute painful. And it seems to me that what is being said is simply that the language is looking to those that it's looking at volume that is not exempt at the time of removal. It doesn't speak to it doesn't speak to expressly to the proposition that you are making that it locks in the tax sheet. It does not. But it makes clear that Congress is that USDA is to apply the current provisions of the Internal Revenue Code, which certainly implies that USDA is to use current rates. Our argument is that the court has to look at all of these provisions of the statute together. I'm not going to tell the court that there is something in here that specifically says you must use current rates. But it is clear looking at the overall provisions of the statute and also what happened after the statute was enacted that this is what Congress intended. Can you explain to me how the tax rate reflects gross domestic volume? Absolutely, Your Honor. Gross domestic volume is the sticks and pounds that are sold by each class, the taxable removals. The allocations are supposed to change with changes in the share of gross domestic volume. In order to get to the share of gross domestic volume, you need to multiply tax rates by removals. Congress did that and it allocated the FEDRA assessments based on each class' share of the excise tax burden. The problem with what USDA is doing is it's multiplying current removals by old tax rates. And in doing so, it is coming up with these arbitrary numbers that don't make any sense. Which brings me back to Your Honor's question about what's wrong with using the old tax rates. USDA argues that it can use the old tax rates forever as a sort of conversion factor. Well, not forever. It only goes to 20 years. Well, for 10 years. And I get that the thrust of my problem is that what USDA did was to use an algorithm that multiplies product times 2003 tax rate. And what it's saying is that by keeping the excise tax rate constant, it's attempting to ensure that adjustments only reflect changes in the volume of tobacco products removed so that everybody's share is more accurately calculated when excise tax rates are held constant. Now, you can agree with that or not agree with that. And obviously, you disagree with that. But what I'm having difficulty understanding is why it's not a reasonable administrative determination to which we would not defer under Chevron. I understand that, Your Honor. The reason it is not reasonable is that it conflicts with the statute which indicates throughout that USDA should be using current rates and that the way that this should be allocated is based on the excise taxes actually paid in the real world. So Section H-2 of the statute tells USDA where to get the information. And it directs USDA to look at forms that relate to the payment of the taxes imposed under Chapter 52. But am I not correct that those forms, as best I could tell from reading this convoluted statute, only relate back or are only relevant for intra-class determinations? No, Your Honor. The statute nowhere says that. And USDA had previously taken the position I'm sorry, Your Honor. But the only other place it's used is in A-3. And in one other place, I think, that does appear to refer to intra-class proportion. The statute does not say directly whether USDA should use those forms at Step A or Step B for the intra-class. And all I'm saying is, as best I can tell, it only uses them in the context of intra-class. Is that incorrect? No, that is contradicted by USDA's own regulation. But right now I'm looking at the statute. The statute says that the forms should be used both to the forms should be used to calculate the volume of domestic sales of a class and by all manufacturers and importers as a group. Right. To get the denominator of the proportion. That's not what the statute says. The statute just says that it's to be used to calculate the volume of domestic sales. And in fact, USDA had repeatedly taken the position prior to CHIPRA that it would use the forms at Step A. The forms don't do USDA much good at Step B because within each class, there's only one unit of measurement. So all USDA needs at Step B is removals. The forms are useful at Step A. Why would they not be useful? And this may just be a mathematical failure on my part. Why would it not be necessary to have a denominator so that changes in overall volume wouldn't be taken into consideration? Within the intra-class? Yes. Because you can just use removals. If you're trying to figure, if you know that manufacturer A. You don't need to know a total? You need to know the total, but you only need to know the total number of removals. Within a class, it's either sticks or pounds. So if you know a manufacturer's sticks and you know the total sticks for the class, you can divide one by the other to get that manufacturer's share of the class. At Step A, the forms are useful because they tell USDA, they allow USDA not to use the tax rates and the removals. They can just look at excise taxes paid, which was the position that USDA took in the Swisher case and in its own regulations. But I wanted to go back and say why USDA gets to the wrong result when it uses old tax rates. The problem is that tax rates can't be used to describe a fixed relationship between sticks and pounds on the one hand and tax dollars on the other. And when Congress changed the rates, it changed the way in which sticks and pounds are converted to the common measurement of tax dollars, which is what you, that the algorithm that Congress selected was we're of the excise taxes paid as a proxy. So when USDA, when Congress changed the rates, it changed the proportions. It said this, the way that we've been calculating the taxes is wrong. So in other words, under the old tax rates, a cigarette was equivalent to ten little cigars. The tax on a cigarette was two cents per cigarette. The tax on little cigars was .2 cents per cigarette, per little cigar. Okay? Under the new tax rates, they're both taxed the same. They're each five cents. Five cents a cigarette, five cents of a little cigar. If the cigarette class's sales go up by 100 sticks in a year from 2011 to 2012, under the old tax rates, that's equivalent to a thousand little cigars. Under the new tax rates, it's equivalent to 100 little cigars. This has a very serious real world impact and it's clear in FETRA that Congress intended USDA to track what was going on in the real world and not to allow it to use outdated tax rates and after those tax rates had been repealed pursuant to Congress's important policy judgments. I see I'm out of time. Thank you very much. You have time preserved for a bottle. May it please the Court, Sydney Foster for the government. Your Honors, the problem with Philip Morris' interpretation is that it is inconsistent with the statutory text. Congress provided the allocations for fiscal year 2001 in subsection C1 of the statute and then it directed the agency to base adjustments to those initial allocations on changes in each class's share of gross domestic volume. A gross domestic volume, of course, is the volume of removals for all six classes of tobacco products and those are measured in different units for different classes. A class's share, an individual class's share of that gross domestic volume then is that class's volume of removals as a portion of the total volume of removals. What Congress was directing the agency to do then was to take account of changes in the relative amounts of volumes that were removed into commerce from year to year and that's precisely what the agency's method for computing the allocation adjustments does. The agency was able to determine the method that Congress used to set those initial allocations. It learned that Congress had taken the volumes for the relevant time period, it multiplied them by the tax rates, the maximum tax rates that were then in effect, which were the 2003 tax rates, and that resulted in dollar figures that then could be compared to reach percentage allocations. Now when the tax rates changed in 2009, the agency was faced for the first time with the question of whether it should change those tax rates in its calculations, but the agency reasonably concluded that it should not because Congress clearly directed the agency to base its adjustments to Congress's own initial allocations based only on changes in each class's share of gross domestic volume. That means that the agency should needed to take into account just changes in the relative volumes that were removed into commerce from year to year. Congress did not direct the agency to take into account changes in tax rates, changes in excise tax burden, and so forth. So the interpretation that Philip Morris is proposing is actually inconsistent with that directive in subsection C-2. I think this is most obvious if you look at the consequence of their interpretation in a hypothetical situation where there was no change in the volume of removals for any class from, say, fiscal year 2010 to fiscal year 2011. In that event, under their method, there would still be substantial changes in the percentage allocations from 2010 as compared to 2011, even though the volumes would have remained exactly the same. That's manifestly inconsistent with subsection C-2, which directs the agency to base changes from year to year in those allocations solely on changes in each class's share of gross domestic volume. In that hypothetical, there clearly could not have been any change in the class's share of gross domestic volume. Plaintiff seems to be suggesting that share of gross domestic volume is necessarily the volume times tax rates, but that's based on nothing in the statute. Volume is defined in the statute as the actual amount of removals, and that's how the agency has indeed interpreted the statute. Could you help me with the relationship between gross domestic volume and total volume of domestic sales? Absolutely, Your Honor. Those are related but different concepts. A class's volume of domestic sales, that is a concept that, as Your Honor pointed out, is used only with the intra-class computations. A class's volume of domestic sales is the number that's equal to the volume of removals for that class for whatever the relevant time period is. So, for example, a given time period, the cigar class's volume of domestic sales might be 100 cigars, if that's how many cigars were removed in that time period. The share of gross domestic volume for a class, by contrast, compares that class's volume of removals with the removals in all six classes of tobacco products. So a class's share I want to step back a little bit. You might. Sorry. So a class's share of gross domestic volume would be the volume of removals for that class as a portion of that whole, the volume of removals for all six classes of tobacco products. So using the same example I just used, the cigar class's share of gross domestic volume in that circumstance would be its contribution of 100 cigars to whatever the total volume of removals for all six classes was. So that would be 100 cigars plus perhaps 1,000 cigarettes, you know, 5 pounds of snuff and so forth. So they're similar concepts but they are treated differently and I think that's clear from how the agency implements the statutory command in subsection C2 that it's not treating that as the share of gross domestic volume in that subsection as volume of domestic sales. Volume of domestic sales is a concept that is referred to only in three parts of the statutes, that's subsections G and subsections H, and those subsections do apply only to the calculations that take place at the second step of the analysis when we're allocating assessments within a particular class. We know that they only apply in that circumstance because by their terms they only apply to the calculation of volume of domestic sales. That term is used only one other place in the statute, as Your Honor noted, and that's in subsection A3, which is the definition of market share, which is a concept that's used only with the intra-class allocations. The market share is defined to be a company's individual share of the class's assessment portion. So it's true that volume of domestic sales sometimes is calculated for an individual company, sometimes for a class, but that is, as Your Honor pointed out, because when we're doing distributing assessments among companies within a class, you need to have a denominator and then that denominator is the volume of domestic sales for the class. Now we have also pointed out that the agency uses current tax rates and tax information in the calculations that take place with the intra-class calculations. But just to explain, and as we explained in our brief, that's not inconsistent with the agency's interpretation of the statute because those current, that use of current taxes paid is merely a proxy for calculating based on volume. The agency only does that for five classes of tobacco products, the classes that a given unit of volume is always taxed at the exact same rate. So if you compute an individual company's share of the class's total volume, that's mathematically equivalent to that individual company's share of the excise taxes paid because of how the mathematics works on that. So that's fully consistent with the approach that the agency has taken. Your Honors, at bottom, what Philip Morris is asking this court to do is to rewrite the statute to provide that adjustments to class allocations should be based on changes in each class's share of the excise tax burden, but that is not what the statute says. The statute provides that the adjustments to the allocations should be based on changes in each class's share of gross domestic volume, and the agency's interpretation of that directive reasonably implements it by ensuring that its changes from year to year are based on changes in the relative volumes removed by each class. If the court has no further questions, we would ask the court to affirm. Thank you. Thank you. Mr. Jarko? May it please the Court. USDA reasonably construed the statute when it decided to use a single variable, namely product volumes, in its methodology. It's obviously reasonable because the sole statutory provision governing Step A adjustments, Section C-2, only refers to one variable, and that is product volumes. I'd like to address, if I may, the statutory references that Philip Morris relies on because I think that they're easily dismissed as justifications for reversal. First, the reference to the definition of gross domestic volume with respect to taxes. In context, that provision relates to another section that immediately follows it, Section B-1, which defines which companies must pay these assessments. That section says that they must be paid by each manufacturer and importer that, quote, sells tobacco products in domestic commerce in the United States, end quote. The definition of gross domestic volume defines, more specifically, what those products in domestic commerce are. And the first condition is that they must be removed from the warehouse, but understanding that some products that are removed from the warehouse still never enter commerce because they may be directly exported from the United States, never sold in the United States, they may be used for experimental use, they may be used for the use of the United States government, and so on, there's a reference to not being exempt from tax. And as we point out, and we provide the citations in a footnote in our brief, the reference to these exemptions are all to products that are not in domestic commerce. Now the reference to not being exempt at the time of removal is simply a clarifying comment that pinpoints which products we're talking about. The reference to current law is a reference to current exemptions, not a reference to current tax rates. As the court has indicated in the colloquy before, there's no reference to tax rates at all in the statute. What there is is a reference to current exemptions from tax, and that does not answer the question which tax rate must be applied. Moving on to the provision and the single word share, which as we indicate in our brief, if the court were to accept Philip Morris' argument, it would be relying on a single word to reverse the ordinary meaning of the statute, because the statute refers to one variable, and if the court were to accept Philip Morris' share interpretation, it would be holding that the variable is nowhere mentioned in the text of the statute. The word share appears in the Step A allocation provision as a different term than percentage, and disproves Philip Morris' argument that percentage necessarily means share. What the statute says is that the agency must adjust the quote unquote percentage to reflect changes in the quote unquote percentage of the quote unquote share. And as government counsel has explained, the term share means a contribution, sort of a general term for a company or class' contribution to the total basket of tobacco products. It does not mean, does not necessarily mean a calculated percentage. The other thing is that the term share, when it's talking about a share of gross domestic volume, in context it's talking about physical products, not a share of taxes. The definition of gross domestic volume itself refers to the quote volume of tobacco products, unquote, and the term held in that provision, the share of tobacco products held, also connotes physical products. It's hard to understand with an ordinary meaning construction of the statute how a rate change that did not change volumes could possibly be a change in the volume quote unquote held by a class. The next flawed premise that Philip Morris relies on, of course, is also is the notion that even if share did mean a percentage, it necessarily means a percentage with current tax rates. There's nothing to support that. And as I indicated previously, the reference to currently tax exempt products does not mean under current tax rates. The third textual basis that Philip Morris seeks to rely on is this information submissions argument. And I think it's important to understand that in raising that argument, Philip Morris is essentially directing the court to an insignificant administrative provision having to do with the mechanics of administering the statute and elevating its importance to one that's more significant than the provision that directly addresses the class A allocations, which is the one that only refers to the single variable being volume. Under Chevron Step 2, that's an argument that the court can easily dismiss. Now, every reference to those information submissions in the statute is to the term volume of domestic sales, which as your honor pointed out is a term that only applies for purposes of Step B. And it is a term that the agency has consistently interpreted as only applying to Step B because as the briefs point out, the agency has consistently done its Step A calculations based on publicly available information, not on the information submitted in those forms. And in practice, the only use of those forms that the agency has made use of is for purposes of Step B. Finally, a word about the policy argument, your honor. Philip Morris' argument that there is no quote unquote neutral metric for purposes of Step A is just another way of saying that the rate that is chosen definitely will affect the outcome. There's no requirement in the statute that the metric should be neutral in the sense that it would not affect the outcome of the statute is that it be constant. And the reason that it is a requirement that it be constant is because there is only one variable that is referred to in the text of the statute and that is volumes. Because there is only one variable under ordinary statutory interpretation principles, exclusio unius on the face of the statute, any other variables would be excluded. And under a deferential standard of review, under Chevron Step 2, it's obviously a reasonable interpretation of the statute for the agency to conclude that in a statutory provision that only refers to one variable, volumes, that their methodology will only use one variable and that is volumes. We ask that the court affirm the judgment of the district court. Thank you, Mr. Tarko. Ms. Goldman? Thank you, your honor. A few points by way of rebuttal. First, I just want to underscore that there is no deference paid to the agency at Step 1 of the Chevron analysis. Both USDA and the cigar industry are asking the court to apply deference, but the first question is what Congress intended. Second, USDA is reading the word share right out of the statute. Both CAA and USDA argue that the only changes that are relevant are changes in volume, but that is not what the statute says. The statute does not say that USDA should adjust for changes in gross domestic volume. They say the statute says changes in the share of gross domestic volume held by each class. And all of those words are important. You get to a share only by multiplying removals times tax rates. That's what USDA does now. It's just using the wrong set of tax rates. So if tax rates change or removals change, that product changes. The other problem is that USDA is saying that share of gross domestic volume is the collection of sticks or pounds contributed by each class. I'm trying to visualize if, for instance, everybody's shares doubled. The shares have obviously changed. The volume has changed. I don't know why you still need to arrive at a percentage. I'm not quite sure I'm following the first argument you're making. Well, Congress recognized that it couldn't just compare gross domestic volume, which is sticks and pounds. It had to figure out a way of using a common metric. The common metric that Congress used was the product of tax rates and removals. So the share of gross domestic volume is something that you can only get by multiplying tax rates by removals and dividing by the combined sum of all of the tax rates by the removals. But volumes can change without changing shares. Volumes can change without changing shares. Tax rates can change and thus change the share. The way that USDA is reading the statute, it's ignoring the word share and saying we can only change the allocations based on changes in the number of sticks and pounds. That is not what Congress wrote and it's not what Congress intended. It begs the question because the question is how is volume compared across classes? When Congress amended the rates in 2009, it was deciding that it had been measuring volume the wrong way, that cigars were undertaxed relative to the amount of tobacco they contained and to their value. Congress intended to equalize the rates across the classes. And so when it did that, it was saying we're measuring volume the wrong way. And what USDA is doing is it's saying we're going to ignore the fact that Congress said that it was measuring volume the wrong way and we're going to stick with that old way which Congress has repealed. And that's not something that an agency has the power to do and it's not something that is in accordance with the way that the statute is written. Now USDA also argues, makes two contradictory arguments about the use of these forms that report the excise taxes actually paid under current rates. USDA says that under the statute, those forms are only to be used at step B in the intra-class divisions. But USDA also says that they're superfluous at that stage and that USDA just uses them for its convenience. Those two things can't both be true because Congress said that USDA shall use the forms. If they're not necessary at step B, which is what USDA just said and what USDA says in its briefs, then they must be necessary at step A. It's also not in accordance with what USDA told the court in Swisher in the 11th Circuit when it said that Congress had directed USDA to use the forms at step A. At bottom, what USDA is saying is that it should be allowed to use these repealed rates for the life of a 10-year program to compare volume across classes after Congress has said that those repealed rates don't actually allow you to compare volume accurately across classes. They're reading words out of the statute. They're giving the same definition as the court pointed out. They're giving the same definition to two statutory terms that are distinct. They're saying that the volume of domestic sales of a class is the sticks or pounds contributed by that class. So if a cigarette class makes 1,000 sticks, then its volume of domestic sales is 1,000 sticks. They're also saying that share of gross domestic volume, which is a distinct statutory term, also means the product that is removed by a class and its contribution. So it would be the same 1,000 sticks. So those two terms to USDA mean exactly the same thing. And meanwhile, they're defining gross share of gross domestic volume, which appears in two different places in the statute, but is the same language. They're defining it in two different ways because they're saying that at step A, share of gross domestic volume is 2,003 rates times removals, and at step B, if I could just finish my sentence, I'm out of time, and at step B, it's current rates times removals, which gets you to a very different result for that same statutory term. At step 1 of Chevron, USDA's approach is entitled to no deference. It violates the structure and the language of the statute, and it vitiates congressional intent, and this Court should reverse. Thank you very much. We will step down to Greek Council and proceed directly to our last case.
judges: Allyson K. Duncan, Stephanie D. Thacker, Gina M. Groh